3-17-0685 Consolidated to 3-18-0166 for oral argument. Tiny Mididero as administrator for the estate of David Mididero, deceased. Appellant by George Sato versus Flevioland, LLC. Gathering by John McKenzie. Please proceed. Good afternoon, Your Honors. My name is George Sato. I am counsel for Heidi Mididero, executive of the estate of David Mididero, the former deceiver in this case. This appeal began as an abject lesson about how deceivers can sometimes turn into lightning rods for harassing and litigation aimed at other parties or judicial orders. However, a little more than a year ago, this case took a tragic turn. David Mididero passed away at the age of 48 due to terminal brain cancer while this appeal was pending. And this case has thus transcended, I think, in some respects, the somewhat narrow but interesting intellectual issues about contract formation and the rights of the receiver and the scope of a court's discretion. And it has become somewhat more universal because this is about the rights that we all have upon our death. And the rights – well, we all face that same fate, and I think we all would wish that our loved ones were provided for and, more importantly, not thrown into a free-for-all with creditors who are seeking our assets outside of the orderly administration of the court. Before he died, the underlying case involved Dave's claim of the lease commission in his capacity as a mortgage foreclosure receiver in the amount of a little more than $28,000 to the lease extension that he was instrumental or he believed that he was instrumental in securing the appointment order under which he was appointed, entitled him to claim a flat $4.75 commission on lease extensions. The debtor, Cleveland, was able to refinance his loan and have the foreclosure case dismissed. He objected to his claim of the lease commission. Judge Cory Lund, who was not the original judge that appointed him, agreed with Cleveland's objection and also elected to sanction Mr. Vidiviero for even making that claim for that lease commission, allowing Cleveland Land to be reimbursed with attorney's fees in the amount of around $13,000. He also denied – he did not allow for Dave to file a final accounting. Dave had to move for a final accounting to dispose of the remaining assets in the operating account, and Dave was denied his right to file a petition for reimbursement of his fees. Now, before he – while this appeal was pending on that matter, Dave was fired by the minister, and he had made some offers to resolve this case. He had offered, for instance, to Cleveland Land to simply refund the claimed lease commission, but Cleveland Land insisted on also getting its attorney's fees. Dave also, because he wanted to shield his family, presumably, he pledged his personal assets in the form of two CDs that he had deposited at every credit bank in exchange for a stay on execution of the judgment. This was pending this appeal. Cleveland Land rejected that. Upon learning of Mr. Vidiviero's death, Cleveland Land exercised self-help, and they now had knowledge of where Dave's personal assets were located at every financial bank. They issued a third-party citation to every financial bank, and this was at a time literally the day or two after Dave had passed away. His wife was still making funeral arrangements, and the only notice they served upon anybody connected to Dave was sending a copy of that notice to me, his former attorney at that point, because I'm no longer his attorney. I objected to that. They did not even notify the widow, and there was a hearing set on January 5th where I appeared merely as an officer of the court to inform the court the day he passed away. At that hearing, the judge entered a briefing schedule and also entered what was essentially an injunctive order, ordering MD Financial Bank to hold on to Dave's money. Let me ask you something. That money at the bank, was it not in the exact amount that your client, your former client, wrote himself a check for out of the lease commission? There were two CDs, one in the amount of the check for the lease commission and one in the amount of the attorneys. And the trial judge found that Mr. Matadero, while alive, had, in the judge's words, converted those funds? Essentially, yes. And then those funds are traced directly to this account at the bank? No, no. The funds that were converted were funds out of the receivership operating account that were withdrawn, and I'm not sure where those funds exactly went. It would be quite a coincidence, would it not, if these CDs or whatever were in the exact amount to the penny? It's not a coincidence. This is deliberate. This happened several months later, after the June 5th order. Dave, in order, after we had, I believe after we had filed the appeal, in order to obtain a superstitious say, we needed to present a law. And so Dave, as one of his final acts, withdrew his own money. I'm not sure from where, and deposited it in the form of CDs at the bank. Well, in layman's terms, conversion is stealing, right? Sure. That's a lawyerly term for stealing. Can you take title to something by stealing it? Well, no. By definition. Okay. So if, in fact, these were converted funds, neither Mr. Metadero nor his, ultimately his estate, had good title to it, did they? Well, again, we're talking about two separate sets of funds. The money that was in the form of a lease commission, I believe, was paid over to Seattle Guilty Advisers, which is an LLC or a membership interest. Perhaps a controlling membership interest, but I believe it went into their operating account, whereas money that was used to purchase the CDs was his own personal money. So these are, I'm not sure that the amounts are the same, but it's not the same specific fund. So the money, you're not quite sure where the money actually, the money that's disputed with regard to the conversion, you're not sure where that money went. Correct. That money went someplace, but then later on, when he establishes the two CDs, he separated those out into the two issues that are, the two main issues. Correct. One was the amount of the funds that are trying to be disgorged. That came from his personal, some personal account. And then, which may or may not have some of the other funds, you have no idea. I have no idea. Nobody has any idea of that. And then the second amount would be for the allegation about attorney's fees up to a certain point. Yeah, the $13,000. Right. And so those came out of separate, I mean, an account in his name, the decedent's name. Presumably. All you know is he came up with the funds. Correct. And you separated them out based on the two types of disputes. I gave him the amounts. I said, try to come up with a lot of specific amounts. And that's to? Obtain a stay. That was the offer that we made to the other side, is if you stay on the execution of judgment, and then we can let this court decide the legal issue as to whether this is a conversion or not, whether we have a right to this decedent. Okay. So, hypothetically, if they'd have accepted your offer, these CDs up there and the exact amount, and, hypothetically, if you lost this appeal, what would have happened to that money? Well, that money, if it would have lost that appeal, would have gone over to them, if they had accepted it, hypothetically. And that was, again, the offer that we made, I think, as a fair offer. Now, as a pure matter of law, the turnover order on February 23rd was in prompt. And this is clear from Sections 2-1402B, which states, which requires that a copy of the citation be sent to the judgment never, before a citation can be held. And 2-1402D, which states that no order or judgment can be entered under subsection C, the turnover order, in favor of the judgment precedent, unless there appears a record of certification of mailing, showing that a copy of the citation and a copy of the citation notice was mailed to the judgment that has required subsection C. In this case, the certification that was filed did not state that it was mailed to the judgment that it stated it was mailed to me. Okay. And the purpose of that rule is what? To give people notice. Correct. But by the time there was a turnover order, there was notice, right? Didn't you ultimately come in and enter your appearance on behalf of the estate? Yes, I had at that point appeared on behalf of the estate and filed an objection to the jurisdiction of the court. That was based on timing? It was based on the lack of notice. Yeah. I mean, they could have cured this. They could have sent it for a new notice to the estate representative. But at that point, they would send notice to tell you something you already knew? I mean, that's typically how a judge's personal jurisdiction works. Well, there's no personal jurisdiction issue because you walked into the courthouse and didn't enter a special limited appearance but entered your appearance on behalf of the estate. That's a general appearance, isn't it? Yeah, but they abolished special limited appearances. There is no such thing as special limited appearances anymore. You appear generally, you file an objection to the jurisdiction. That's exactly what they did. But I think this goes beyond just pure law. This goes to a question, this is a case of personal oppression. This exact fact, I believe, is a case of personal oppression in the state of Illinois. And this is about what happens when we die and whether or not there is an enforceable orderly administration of assets or whether it's a free-for-all. And I think that this is an important time for this court to lay down a marker of basic human decency. There's no reason why they could not have followed the Illinois Abatement Act, either moved for a special representative or waited for an estate to be created. They took self-help. They moved quickly to jump in line, to end-run this process, and that would have led to chaos. It would have... Well, where's the money now, the 28 grand? Well, presumably some... I hope it's in a legal way, Mr. Chairman. I'm not sure if they expect it. My understanding is put in escrow to be held. No, I don't believe so. I believe they took the money. So, I mean, that's a good question of whether or not they escrowed it. No, no. I believe, to me, that they escrowed it. So... Two minutes, please. As to the underlying dispute, well, I mean, before I get to that, there is also the issue of 12-103 of the Civil Code, the Code of Civil Procedure. Again, these were his personal assets, but the judgment was against him in his capacity as a receiver, and so he was immune to judgment. I believe I fully agreed with this issue. But, again, that was a prejudicial act that happened before I filed my clearance on January 5th, when the court ordered, an injunctive order, ordering any financial bank to hold on to his personal assets. Without that injunctive order, it's possible that those assets could have been mortgaged by his estate. You're talking about his estate? His estate, correct. Now, that problem has to do with the underlying dispute. I know you raised the issue of whether this is conversion or not. I believe that there is an insufficient record for any court to determine whether or not this was conversion, whether or not he was instrumental in, or necessary, even, in having this case essentially be ratified. So the doubts expressed by the attendant, there's a real serious question as to the efficacy or the validity of a single-sign lease. You don't have a copy of the original lease, which this lease extension amended. But I think more fundamentally, the circuit court there is a matter of law in entering the attorney fee award. He's not a litigant. The receiver is not a litigant. He's an officer of the court. And Rule 137 doesn't apply, and that's the only justification they're given. And so... You're saying that Rule 137 can never apply to a receiver? Yes. I believe that's... The cases outside of William J. Tumbleman, W. E. O'Neill, and In Ray Merritt, Those are the cases you're saying agree? Yeah, those are the cases I'm saying agree. Also, Rule 137 only applies to attorneys. With that, I will reserve the balance of my time. Thank you very much. You're welcome. Good afternoon. John Kinski on behalf of the Appellate Leveling. It's a true honor to be in this really interesting courthouse. As you know, we essentially have two appeals that are going on. The first appeal, the appellant's fundamental argument, seems to be that the court lacks the discretion to reject the commission, which is pre-authorized, allegedly. In sum, he does not recognize that the receiver is working for the court. Curiously, the ex-receiver fails to recognize that the appointment order essentially says that Mitadero, quote, can receive compensation pursuant to a payment schedule. It didn't say shall receive it. It does not take away the trial court's discretion. In fact, the court maintains its supervisory role here by requiring the receiver's report every 90 days. Finally, Section 1704D talks about allocations overseas, and it can only be done if it's allowed by the court. Bottom line is the court has the discretion, and quite frankly, the duty to review these things, make sure that the receiver is doing what he's supposed to do. The court correctly held that the receiver had not opened his commission. The bottom line is there are so many facts that are not disputed, and I'll lay them out. Cleveland made an offer to extend the lease on September 9, 2016, to Crane. Crane accepted the terms of that on October 21 and executed the lease. On October 28, Mitadero is appointed receiver. The lease has been consummated already before he became a receiver. It's also undisputed that the ex-receiver made material representations to the court in his second receiver's report, which was verified. When he stated, quote, unquote, he completed final negotiations and executed the lease amendment. It's undisputed he did not sign the lease amendment, as he had passed the fully executed October 24th lease amendment, which was signed by Cleveland and Crane. It further is undisputed that the receiver paid himself $28,640 in commissions on January 26, 2017, well before asking the court for approval to approve that fee. It's also undisputed the receiver buried the commission as an expense, rather than highlight it by putting it in the receiver's billing statement. The receiver, in all of his briefs to the lower court and the briefs to the bis court, has never, ever even addressed those issues. He's just come up with some sort of plausible argument to try to get out of the mess that he created. The bottom line is, to constitute a valid lease, there must be an offer. There was. The September 24th extension that we sent out. There was the acceptance that was signed by Crane, and that acceptance must comply strictly with the terms of the offer. They didn't change any of the terms of the extension. Again, I'll reiterate, it was a binding lease before he became a receiver. Now, their arguments all deal with the procedural aspect about due process, getting notice to the right person, right? That's the second part of the appeal. The first part of the appeal deals with the egregious conduct of the receiver. I mean, what happened was, I believe it was March 20th, the receiver filed his motion for his second receiver's report to get that approved. The bank had filed a motion to dismiss the action, the foreclosure action, because they couldn't pay. What occurred then was, there was an order entered, and it was agreed that the receiver was discharged as of March 20th. All the funds that he was sitting on belonged to my client. Judge Bloom entered an order requiring him to immediately disperse over all the funds, with the exception of the $28,640 that were in dispute regarding the commission. That was to be held in escrow until the judge decided. Now, what occurred throughout this process was the receiver did not follow court orders, did not immediately turn over the money, did not turn over the $26,000 that was not in dispute until October of the following year. So there's a whole history of the receiver not following the court orders. Well, let me ask you, counsel mentions that Rule 137 can never apply to a receiver. What say you? I think that's ridiculous. I think the court has the ability to surcharge or tax or do anything to his receiver, especially when they're essentially converting money. And what you have here is it just never happens. These receivers get appointed, and nobody reads the receiver's report. Nobody cares. There's these big long reports. You put the things in the expense account. Who reads it? Who's going to object? What we had here was Cleveland came by, paid off the bank. We had a real interest to see what was going on. This is our money. And they took $28,000, $640, and said that they executed the lease and were responsible for it. But it was clear the facts are undisputed. They did nothing. They never put forth any kind of affidavits to dispute anything. It was all there black and white. And the reality was is the receiver and its counsel essentially told the judge, you have no discretion here. Our role is as big as yours. And it's a scary proposition that a receiver thinks that he can carte blanche, pay himself whatever he wants without getting court approval. I do a lot of bankruptcy work in Chapter 11. We have to do fee applications. We go before the court. We ask for allowances. That's what the receiver is supposed to do. Not just go pay yourself and bury it, thinking that nobody is going to catch it. And that's what happened. Now as to the second part of the appeal, the estate in its brief essentially confuses service with notice. Supreme Court Rule 277 allows a judgment creditor to collect against third parties holding assets of the judgment debt. That's essentially what Flevoland did. Flevoland served a third party citation upon entity financial bank, not the judgment debtor, by a process server. That creates a citation. 1402B just essentially requires we give notice. The purpose is to allow the party to come in and object and say it's exempt, not exempt, you can't give this. We served notice. They came up. Mr. Stato appeared on behalf of the estate and his appearance on the estate, argued, filed a brief in opposition to the motion for turnover, and then when we had oral argument, Mr. Stato didn't even appear to the court.  We believe the court made the right decision and we're going to turn over the money. And when you're talking about the turnover of the money, we're talking about the $26,000 and change, what he paid himself. What happened was the $28,600 was the commission plus the $13,000 in attorney's fees. Now are the attorney's fees a separate issue? Because with respect to the attorney fees, isn't Cleveland just a judgment creditor against the estate at that point with respect to the attorney fees? I believe so. Nobody knows where those monies came from. There's no evidence that it's his personal assets. I have to assume Mr. Minadero owned CR Realty Advisors. That was the company that was in reality the receiver. And I'm just speculating. He took the money from CR Realty Advisors, said, here, we're going to use this to stay the enforcement of the judgment. No, the question is dealing with the attorney's fees. Where is that? What's the basis, the foundation for an order on attorney's fees? The court did not essentially say it's under 137. I know. So what are you telling us is the authority? I think it's the authority of the court, the inherent authority of the court to control its court. You found the conduct to be egregious. You found the theories to have no basis. And it cost Cleveland a lot of effort and money to get its own coverage. I didn't find them in contempt. I mean, where does that come from? You did not find them in contempt. The court did kind of instruct me, because I will welcome and want you to bring a petition for contempt against Mr. Vitadaro. He found the conduct by Mr. Vitadaro to be the most egregious he's ever seen since he sat on the court. Okay. But given all that, with respect, and I'm just going to ask about the attorney fees at this point, with respect to that, so now you've got a judgment for attorney fees? Yes. Okay. So what gives that priority? Now the judgment debtor is deceased. So what gives that judgment debt priority over every other probate claim? I mean, hypothetically, you could have somebody out there that stole money from or cheated 80 people, and I'm not saying Mr. Vitadaro did that, but I'm saying you have this person out there and some of these flim-flam guys rip off 80 people. Well, this guy's got this judgment from a judge. How come he, and maybe the pie isn't big enough to pay everybody, so maybe these people with those judgment debts got to go on a probate and fight for the money? Well, that's Counselor's Illinois Abatement Act, which he filed more or less on his reply. It was never raised before the trial court. It was never raised in its opening brief. We filed a motion to strike those portions. The reality is we served the citation. We pre-perfected the lien in those properties. The estate had its opportunity. They had the opportunity to come in and make their arguments. They filed it. They lost. See, I'm wondering. I know you got the money, and I know that the judge made some comments. Where is the authority in the law that allows this separate fund coming down the way it's come up before us and came up at the trial court? What basis is there in the law to get those attorneys' fees? You didn't have a contempt hearing. You didn't have a scrutiny. Okay, so where's this coming from, this authority, to just assess these fees and make them, in essence, priority claims? By the way, it's de facto priority claims, right? Where would they fit in the probate act? Well, in the June 5th hearing, in which the court found that his conduct was egregious and that he had converted the funds, the court then instructed and essentially stated that I would entertain a petition for fees. We filed a petition for fees. Mr. Mittadowne never objected to the petition for fees. The court on September 20th, when it made the final order, granted the petition for fees. You're not arguing a waiver, are you? He certainly did object. I mean, talking about in the briefs, was there that kind of argument? I pointed it out, but he did not object. Maybe not as vocally as I'm doing right here. On what basis was your petition for fees filed, other than the judge's request? I'm asking the same question. It's the court's inherent authority to control the court. I mean, he found that his receiver, the court-appointed receiver, stole money, lied about it, hid it. That's egregious conduct. There are ways to handle egregious conduct. There has to be. There has to be further. $137,000 would be a way, wouldn't it? It would. Let me ask you this. With respect to the, for lack of a better term, not the fees, but we'll call it the principal amount, the $28,000 in change, was that able to be traced to those CDs? I mean, was it going to one account and then come out of that account to purchase the CDs? I don't know, but it sure seemed like it matches up perfectly. And the estate did offer that money up as, in essence, an appeal bond. The estate, well, not the estate. The ex-receiver filed a motion requesting that the court stay, enforcement of the judgment. And they offered to post those two CDs. And it was offered in the role of the ex-receiver in that motion. And what happened, we didn't object. Again, what happened was, it was filed so far after the court had the ability to stay, it was worthless. Furthermore, counsel didn't even appear at the hearing, so it was denied. So what then occurred was, we have the right to go collect. We're in the process of putting together a third-party citation when Mr. Mendodero passed. We just kept going forward. As a judgment creditor does, they collect his money. Two minutes, please. And you have collected the money? We did collect the money. It was turned over by the bank shortly after the order of February 20th. Can you go back briefly to the fee issue? Your petition didn't ask for $137,000. I did not file a motion for $137,000. But I believe $137,000 applies. But if so, what papers were filed? In my objection, the initial objection to the compensation, as we got into it and we started finding all the misrepresentations and the hiding of the things and the fact that he had already paid himself, we thought that the $128,000 we were seeing in the order should have held an escrow. We didn't realize this when we went through it. He had already paid himself. So it wasn't like the $128,000 needed to be held in escrow. It needed to be disgorged. He just wrote a check and paid himself. So as I'm writing that objection, in the prayer for relief, I did say that this conduct was so bad that it warranted that the court would award us reasonable attorneys fees to bring him in. And Judge Linden apparently felt the facts warranted it. And I obviously agree. No further questions? Thank you. Thank you. Just briefly, I did object to the attorney's fees in the underlying case. I think you'll see that in my motion for reconsideration. That was to the June 5th order. Did you do it in a motion to reconsider or did you object before the award of attorney fees was made? Well, the motion for reconsideration was filed before the award, the specific award was made. In the June 5th order, Judge Lund said, I am awarding your attorney's fees. Please file a petition. And so on June 28th, I filed a motion to reconsider that order. And I didn't object to the specific amendments because I felt that none of it should be allowed. With respect to your comment about Rule 137, I just took a minute to refresh myself. But it does say it only applies to an attorney who is a party. At the time of the March 20th second receiver's report, David McGarrett, the receiver, is unrepresented. He's not an attorney. And as a receiver, he's not a party. So Rule 137 just doesn't apply. There's a transaction. What's that? Transaction of the authority to initiate Rule 137. Rule 137. Against an attorney or a party. Yeah. I also want to address the larger point, which I didn't address fully in my opening. I mean, part of the reason why I'm standing here is because David is a friend of mine. And one of the reasons why, even though he was a friend of mine, he wanted to appeal and object was because he's had opponents of receiverships. And this, he felt that he would be vindicated. He felt that he had a right to this lease commission. So this notion that he somehow converted funds or that he was hiding anything, there was no, he might have made a mistake. Clearly, he shouldn't have said executed in the second receiver's report. That didn't fool anyone. There was no reasonable reliance on that. They would have objected to the lease commission regardless of whether he said he signed it. But he attached the lease-executed lease extension that was signed by Parks. So he wasn't trying to hide anything. He might have made a mistake. But he wasn't represented by counsel at the time. And the real question comes down to, was he entitled to these funds? Because there is the order. More importantly, was it objectively reasonable for him to think that he was entitled to claim these funds without seeking court approval? Again, for a statutory mortgage foreclosure receiver, they don't have to go before the court to justify every single expense. And with respect to the judge's finding in that regard, what would be our standard of review? Well, the judge did not make any factual findings to which you can defer. The judge said he stole the money. That's a conclusion. I mean, it's hard for a receiver. It actually doesn't even make sense to say that he stole the money because he's a receiver. The funds, the receipts of the property are in custodial debtors. They are his funds. He has possession of them. And most of the time in receiverships, mortgage foreclosure receivership, that money goes to the bank. It doesn't go to the debtor. This was an unusual case. But it doesn't go to the receiver's bank account. Well, certainly. Yeah. No, but I mean, our point was, and his point was, is that he was authorized to charge a flat fee. That was in the order pointing order. He didn't have to go to court every time and say, can I collect $2,000 as my flat fee every month. That was in the same order. It also said if he succeeded in getting a lease extension, that was 4.75 percent commission. And that's what that money was. And he was very clear about that. He disclosed that. So the 4.75 was in the appointment of the receiver. Correct. Yes. It was in the appointment order. If he can collect that commission. He didn't have to, but he was allowed to. So in this case, the amount was the 4.75. Correct. $2,000. Yeah. It was a five-year lease extension. This case is a little confusing, but at what point, at some point, your clients, and I can't remember, was Mr. Matadero or the estate offered up those CDs as an appeal bond? It was the estate before he passed. Okay. So that happened before he passed. If there are further questions, I believe it's all separate. It was separate. I'm sorry. Both of those amounts, those CDs, one was an amount for returns fees, one was an amount in dispute, and the other one was the amount of the underlying fund in dispute. Correct. They were both set up as the appeal bond. Correct. Thank you very much. Thank you both for your arguments. The Court will take this matter under advisement and render a decision at a later date. Now we'll take a recess.